1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W. Scott Holleman (CA BAR #310266)
Marion C. Passmore (CA BAR #228474)
**BRAGAR EAGEL & SQUIRE, P.C.**
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: holleman@bespc.com
        passmore@bespc.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JAMES CARLSON, Derivatively on Behalf of
AMYRIS, INC.,

                    Plaintiff,

        v.

JOHN DOERR, JOHN G. MELO, FRANK
KUNG, KATHLEEN VALIASEK,
GEOFFREY DUYK, CAROLE PIWNICA, R.
NEIL WILLIAMS, PATRICK YANG,
PHILIP EYKERMAN, CHRISTOPH
GOPPELSROEDER, STEVEN MILLS,
ABDULLAH BIN KHALIFA AL THANI,
CHRISTOPHE VUILLEZ, and
FERNANDO DE CASTRO REINACH,

                    Defendants,

        -and-

AMYRIS, INC., a Delaware corporation,

                    Nominal Defendant.

Civil Action No.:

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY,
VIOLATION OF SECURITIES LAW,
INSIDER SELLING AND
MISAPPROPRIATION OF
INFORMATION, WASTE OF
CORPORATE ASSETS, AND UNJUST
ENRICHMENT**

**DEMAND FOR JURY TRIAL**

        Plaintiff James Carlson ("Plaintiff"), by and through his attorneys, submits this Verified

Stockholder Derivative Complaint against the Individual Defendants (as defined herein) and allege the

following upon information and belief, except as to those allegations concerning Plaintiff, which are

alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things,

his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory

filings made by Amyris, Inc. ("Amyris" or the "Company"), with the U.S. Securities and Exchange

1

Commission (the "SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Amyris; (c) review of a purported securities class action lawsuit filed in the United Stated District Court for the Northern District of California against Amyris and defendants John G. Melo ("Melo") and Kathleen Valiasek ("Valiasek"), captioned *Mulderrig v. Amyris, Inc.*, Case No. 3:19-cv-1765 (the "Securities Class Action"), alleging causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and (d) review of other publicly available information concerning Amyris.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action asserting claims for breach of fiduciary duty, violations of securities law, insider selling and misappropriation of information, waste of corporate assets, and unjust enrichment from March 15, 2018 through April 11, 2019 (the "Relevant Period") brought on behalf of nominal defendant Amyris against certain officers and members of the Company's Board of Directors (the "Board").

2. Amyris describes itself as a science and technology leader in the research, development, and production of pure, sustainable ingredients for the Health & Wellness, Clean Beauty, and Flavors & Fragrances markets. Amyris applies its exclusive, advanced technology, including state-of-the-art machine learning, robotics, and artificial intelligence to engineer yeast that, when combined with sugarcane syrup through fermentation, is converted to highly pure molecules for specialty ingredients. Amyris manufactures sustainably sourced ingredients at industrial scale for B2B partners and further distribution to 2,000 of the world's top brands, reaching more than 200 million consumers. Amyris stands by its No Compromise™ promise that everything it makes is sustainably sourced, performs better, costs less, has higher purity and is better for people and the planet than products made with existing processes. Amyris also owns Biossance, the fastest-growing, clean skincare brand in the U.S. that delivers No Compromise™ beauty.

3. This case arises out of the Individual Defendants' repeatedly making false and misleading statements to the investing public regarding the Company's anticipated revenue. Specifically, the Individual Defendants improperly utilized a new accounting rule to record estimated future royalty revenues due from one of its largest customers. These estimated future payments,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

according to the Individual Defendants, would drive the Company's revenues to new records, which would continue to increase throughout the year.

4. The market reacted positively to the Individual Defendants' rosy financial projections and the Company's stock price increased from $5.58 per share on March 15, 2018, to close at $9.20 per share on October 9, 2018.

5. During this same time, the Company's internal controls over financial reporting lacked "sufficient resources . . . to be able to adequately identify, record, and disclose non-routine transactions." Despite knowledge of this material weakness, which remains unrectified, the Individual Defendants began ambitiously applying a new accounting rule to estimate and record license and royalty revenue.

6. In reality, the Individual Defendants were incorrectly applying the new accounting rule. The Individual Defendants were grossly overestimating license and royalty revenue due from the Company's largest customer and would need to restate a number of financial statements. Moreover, the Company, at the hands of the Individual Defendants, was also operating with an undisclosed material weakness in its internal controls.

7. On April 11, 2019, the Individual Defendants announced that Company needed to restate the financial statements contained in its 2018 Quarterly Reports. In explaining these restatements, the Individual Defendants admitted to material errors in estimating royalty revenue under the new accounting rule. They also admitted to the existence of undisclosed material weaknesses in the Company's internal controls over financial reporting.

8. On May 16, 2019, the Individual Defendants announced that the Company would also need to restate the financial statements contained in Amyris's 2017 Annual Report due to additional accounting errors. The Individual Defendants further announced that investors should not rely upon management's assessment of internal controls in the 2017 Annual Report, reiterating that the Company expects to report additional material weaknesses. To date, Amyris has been unable to file its Annual Report for 2018, and it has failed to file subsequent quarterly reports as well.

9. Further, defendants Melo, John Doerr ("Doerr"), and Frank Kung ("Kung") (collectively, the "Insider Selling Defendants") breached their fiduciary duties of loyalty and good faith

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

1    by selling shares of Company stock while in possession of material adverse non-public information.

2        10.    Finally, on April 27, 2018, certain of the Individual Defendants negligently issued a

3    materially false and misleading Proxy Statement (the "2018 Proxy") urging stockholders to reelect

4    certain directors, amend the Company's 2010 Equity Incentive Plan, and approve the issuance of equity

5    awards for the Company's CEO (the "CEO Equity Awards"), all under false pretenses.

6        11.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary

7    duties and other misconduct, Amyris has sustained damages more fully described below.

8                            **JURISDICTION AND VENUE**

9        12.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has

10   jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC

11   Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining

12   claims under 28 U.S.C. §1367.

13       13.    This court has jurisdiction over each defendant named herein because each defendant

14   conducts business in this District, or is an individual with sufficient minimum contacts with this District

15   to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair

16   play and substantial justice.

17       14.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) one or

18   more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial

19   portion of the transactions and wrongs complained of herein, including the defendants' primary

20   participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation

21   of fiduciary duties owed to Amyris, occurred in this District; and (iii) defendants have received

22   substantial compensation in this District by doing business here and engaging in numerous activities

23   that had an effect in this District.

24                          **INTRADISTRICT ASSIGNMENT**

25       15.    A substantial portion of the transactions and wrongdoings which give rise to the claims

26   in this action occurred in the County of Alameda, and as such, this action is properly assigned to the

27   Oakland division of this Court.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF
SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF
CORPORATE ASSETS, AND UNJUST ENRICHMENT

## THE PARTIES

16.     Plaintiff is a stockholder of Amyris and has been continuously since 2010.

17.     Nominal defendant Amyris is a Delaware corporation with principal executive offices located at 5885 Hollis Street, Suite 100, Emeryville, California.

18.     Defendant Doerr is an Amyris director and has been since May 2006. Doerr is a partner at venture capital firm Kleiner Perkins, which invested heavily in Amyris before its initial public offering in 2010.  Recently, Doerr and certain of his affiliated companies have continued to financially entangle themselves with Amyris, including through an April 2019 private placement.   Defendant Doerr sold the following shares with insider information regarding Amyris's false and misleading statements and lack of internal controls, all of which resulted in Amyris stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| John Doerr | 8/16/2018 | 4,877,386 | $6.22 | $30,331,488.06[1] |

19.     Defendant Melo is Amyris's CEO and has been a director since January 2007. Defendant Melo is named as a defendant in the Securities Class Action. He has also been the Company's President since June 2008.  Defendant Melo sold the following shares with insider information regarding Amyris's false and misleading statements and lack of internal controls, all of which resulted in Amyris stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| John G. Melo | 7/16/2018 | 22,355 | $6.61 | $147,703.96 |
| | 10/15/2018 | 5,195 | $7.50 | $38,951.59 |
| | TOTAL: | 27,550 | | $186,655.55 |

In addition, Amyris paid defendant Melo the following compensation as an executive:

[1]   The sale was by Foris Ventures, LLC ("Foris").  Defendant Doerr indirectly holds all of the membership interests in Foris, which in April 2019 led a $34 million private placement of Amyris common stock and warrants to purchase common Amyris stock.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

| Year | 2017 |
|---|---|
| Salary | $579,167 |
| Bonus | $640,000 |
| Stock Awards | $147,465 |
| Option Awards | $43,930 |
| Non-Equity Incentive Plan Compensation | $581,948 |
| All Other Compensation | $934 |
| **Total** | $1,993,444 |

20.     Defendant Kung is an Amyris director and has been since November 2017.  Defendant Kung sold the following shares with insider information regarding Amyris's false and misleading statements and lack of internal controls, all of which resulted in Amyris stock trading at artificially inflated prices at the time of his stock sales:

| Insider | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Frank Kung** | 8/17/2018 | 2,439,848 | $6.22 | $15,172,926.74 |
| | 8/17/2018 | 336,9 14 | $6.22 | $2,095,200.78 |
| | 8/20/2018 | 1,008,816 | $6.22 | $6,273,624.94 |
| | 8/20/2018 | 139,306 | $6.22 | $866,316.15 |
| | **TOTAL:** | **3,924,884** | | **$24,408,068.62[2]** |

21.     Defendant Valiasek has been Amyris's Chief Business Officer since June 3, 2019. Defendant Valiasek is named as a defendant in the Securities Class Action. Defendant Valiasek was Amyris's Chief Financial Officer ("CFO") from January 2017 to June 3, 2019.  Amyris paid defendant Valiasek the following compensation as an executive:

| Year | 2017 |
|---|---|
| Salary | $398,686 |
| Bonus | $45,000 |
| Stock Awards | $137,623 |
| Option Awards | $126,996 |
| Non-Equity Incentive Plan Compensation | $163,085 |
| All Other Compensation | $4,310 |
| **Total** | $875,700 |

[2]   These sales were by Vivo Capital VIII, LLC, of which defendant Kung is a voting member. Defendant Kung may be deemed to share voting and dispositive power of the shares with four other voting members.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

22.     Defendant Geoffrey Duyk ("Duyk") is Amyris's interim Chairman of the Board and has been since May 2014.  He was originally a director of the Company from 2006 through 2011, and then returned in May 2012 to once again become a director.  Defendant Duyk is also a member of Amyris's Audit Committee and has been since at least April 2017.

23.     Defendant Carole Piwnica ("Piwnica") is an Amyris director and has been since September 2009.

24.     Defendant R. Neil Williams ("Williams") is an Amyris director and has been since May 2013.  Defendant Williams is also the Chairman and a member of Amyris's Audit Committee and has been since at least April 2017.

25.     Defendant Patrick Yang ("Yang") is an Amyris director and has been since July 2014.

26.     Defendant Philip Eykerman ("Eykerman") is an Amyris director and has been since May 2017.  Eykerman is an executive at DSM, a company that has had extensive business dealings with Amyris over the years.

27.     Defendant Christoph Goppelsroeder ("Goppelsroeder") is an Amyris director and has been since November 2017.  Goppelsroeder is an executive at DSM, a company that has had extensive business dealings with Amyris over the years.

28.     Defendant Steven Mills ("Mills") is an Amyris director and has been since August 2018. Defendant Mills was also Amyris's CFO from May 2012 to December 2013 and Principal Accounting Officer from May 2012 to August 2013.   Defendant Mills is also a member of Amyris's Audit Committee and has been since August 2018.

29.     Defendant Abdullah bin Khalifa Al Thani ("Al Thani") was an Amyris director from March 2012 to May 14, 2019.

30.     Defendant Christophe Vuillez ("Vuillez") was an Amyris director from November 2016 to May 20, 2019.

31.     Defendant Fernando de Castro Reinach ("Reinach") was an Amyris director from September 2008 to August 2018.  Defendant Reinach was also a member of Amyris's Audit Committee from at least April 2017 to July 2018.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

32.     The defendants identified in ¶¶18-31 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

36.     To discharge their duties, the officers and directors of Amyris were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Amyris were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner

8

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        d.    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

        e.    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

37.    Each Individual Defendant, as an executive officer and/or director, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.    In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code") that is "applicable to every employee, officer and director of the Company."  Per the Code, all of the Company's directors, executives, managers and other supervisory personnel are expected "to help foster a sense of commitment to this [Code] among all [the] employees, and to foster a culture of fairness, honesty and accountability within the Company."

39.    The Code further requires that the Individual Defendants follow the Company's Legal Compliance Policy which states:

You must always obey the law while performing your duties to the Company. You also must always comply with the Company's policies. Our success depends upon each employee, officer and director (a "**Covered Person**") operating within legal guideline and cooperating with authorities. It is essential that you know and understand the legal and regulatory requirements that apply to our business and to your specific area of responsibility. While you are not expected to have complete mastery of these laws, rules and regulations, you are expected to be able to recognize situations that require you to consult with others to determine the appropriate course of action. If you have a question in the area of legal compliance, you should approach your supervisor or the Compliance Officer immediately.

40.     The Code also requires that the Company's books, records, finances, and public disclosures be "fair," "accurate," and "[not] misleading." The Code's "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting" states:

We strive to maintain integrity of our records and public disclosure. Our corporate and business records, including all supporting entries to our books of account, must be completed honestly, accurately and understandably. Our records are important to investors and creditors. They serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. We depend on our books, records and accounts accurately and fairly reflecting our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of our records and public disclosure, we require that:

- no entry be made in our books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

Our disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "**SEC**") and other public disclosures are full, fair and accurate, that they fairly present our financial condition and results of operations, and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should adhere to all disclosure controls and procedures and generally assist the

10

Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand our business and its attendant risks.  In particular:

- No employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- All employees must cooperate fully with our finance department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- No employee should knowingly make (or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

If you become aware that our public disclosures are not full, fair and accurate, or if you become aware of a transaction or development that you believe may require disclosure, you should report the matter immediately to your supervisor, or the Compliance Officer.

41.     The Code further proscribes special responsibilities to the CEO and Senior Financial Officers relating to ethical conduct and compliance.  The Code states:

While we expect honest and ethical conduct in all aspects of our business from all of our employees, special ethical obligations apply to our Chief Executive Officer and members of our Finance Department.  They must adhere to the following principles and foster a culture throughout the Company as a whole that helps to ensure the fair and timely reporting of our financial results and condition:

- Act with honesty and integrity, maintain high standards of ethical conduct and use due care and diligence in performing their responsibilities to the Company, without allowing their independent judgment to be subordinated to personal interest.

- Avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the General Counsel or Audit Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict.

- Provide information that is full, fair, accurate, timely and understandable for inclusion in the Company's financial statements and other disclosure in the reports and documents that the Company files with the SEC or otherwise discloses publicly in the Company's submissions to governmental agencies or in public statements.

- Comply and take all reasonable actions to cause others under their supervision to comply with applicable laws, rules, and regulations of government authorities.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

- Respect and safeguard the confidentiality of information acquired in the course of their work, except when authorized or legally obligated to disclose such information, and not use confidential information acquired in the course of work for personal advantage.

- Share knowledge with colleagues and maintain skills that are important and relevant to the performance of their duties.

- Proactively promote ethical behavior as a responsible partner among peers in the work environment.

- Achieve responsible use of and control over all entrusted assets and resources.

- Report known violations of this Code of Ethics to the General Counsel or Audit Committee.

42.     Finally, the Code states that it is the "responsibility" of the Individual Defendants to report "a suspected or actual violation of the [Code] standards by others."  The Code states:

***Clarifying Questions and Concerns; Reporting Possible Violations***

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging to the Company and should be avoided.  If you are aware of a suspected or actual violation of Code of Ethics standards by others, you have a responsibility to report it.  You should raise questions or report potential violations of this Code of Ethics without any fear of retaliation in any form – it is our policy not to retaliate in such circumstances and we will take prompt disciplinary action, up to and including termination of employment for cause, against any employee who retaliates against you.

Supervisors must promptly report any complaints or observations of Code of Ethics violations to the Compliance Officer.  The Compliance Officer will investigate all reported possible Code of Ethics violations promptly and with the highest degree of confidentiality that is possible under the specific circumstances.  As needed, the Compliance Officer will consult with the Legal Department, the Human Resources Department, the Nominating and Governance Committee and/or Audit Committee.

If the investigation indicates that a violation of this Code of Ethics has probably occurred, we will take such action as we believe to be appropriate under the circumstances.

43.     In addition to these duties, under the Audit Committee Charter, defendants Duyk, Williams, Mills, and Reinach (the "Audit Committee Defendants"), owed specific duties to Amyris to assist the Board in overseeing "the Company's accounting and system of internal controls."  The Audit Committee Defendants are also responsible for overseeing "the quality and integrity of the Company's financial reports."  Moreover, the Audit Committee's Charter provides:

In order to fulfill its purpose, the Audit Committee is to:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

- oversee the Company's accounting and financial reporting processes and audits of Company's consolidated financial statements

- oversee the Company's relationship with its independent auditors ("*Independent Auditors*"), including appointing or changing Company's auditors and ensuring their independence;

- facilitate communication among the Independent Auditors and the Company's financial and senior management and the Board; and

- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Independent Auditors and the Company's financial and senior management.

\*     \*     \*

## III. RESPONSIBILITIES AND DUTIES

\*     \*     \*

The Committee will:

**Financial Statements and Disclosures**

1. Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public.

2. Review the Company's quarterly and annual financial statements, including any report on the Company's internal control over financial reporting, and any report or opinion by the Independent Auditors.

3. In connection with the Committee's review of the annual financial statements:

- discuss the financial statements and the results of the Independent Auditors' audit of the financial statements with the Independent Auditors and management;

- discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board; and

- discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices.

4. Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.

5. In connection with the Committee's review of the quarterly financial statements:

- discuss with the Independent Auditors and the Company's management the results of the Independent Auditors' review of the quarterly financial statements and resolve any issue that may arise;

13

- discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies (internal or external), judgments or estimates with the Company's management and the Independent Auditors; and

- discuss and assist in resolving any disagreements between the Company's management and the Independent Auditors regarding financial reporting.

**Internal Controls**

6.  Periodically discuss with the Company's principal accounting officer the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company.  Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

7.  Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.  In doing so, the Committee shall evaluate the Company's compliance with Section 404 of the Sarbanes-Oxley Act of 2002, including risk management required thereby.

8.  Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

9.  Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

10. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or Independent Auditors believe should be discussed privately with the Committee.

11. Meet separately, periodically, with management and with internal auditors (or other personnel responsible for the internal audit function).

12. ***Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management***.

13. Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and violations of the Company's Code of Business Conduct and Ethics or other legal policies or applicable law; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters or violations of Company policies or applicable laws (the "***Whistleblower Policy***"), and any changes therein.  Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

\*       \*       \*

**Independent Auditors**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

*       *       *

18. Review and discuss with the Independent Auditors the reports delivered to the Committee by the Independent Auditors regarding:

- critical accounting policies, estimates and practices used;

- alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the alternatives, and the treatment preferred by the Independent Auditors; and

- other material written communications between the Independent Auditors and the Company's management, such as any management letter or schedule of unadjusted differences.

**General**

19. On a regular basis, review the status of any legal and regulatory matters that could have a significant impact on the Company's financial statements.

44. As described below, the Audit Committee Defendants failed in these responsibilities.

45. In addition, the 2018 Proxy contains a description of the Company's corporate governance principles which states in pertinent part:

> The Board has adopted written Corporate Governance Principles to provide the Board and its committees with operating principles designed to enhance the effectiveness of the Board and its committees, to establish good Board and committee governance, and to establish the responsibilities of management and the Board in supporting the Board's activities.

46. To this end, the Company's website in its "Investors" section, under the "Corporate Governance" subsection states:

> The Board of Directors of Amyris (the "Company") sets high standards for the Company's employees, officers and directors.  Implicit in this philosophy is the importance of sound corporate governance.  It is the duty of the Board of Directors to serve as a prudent fiduciary for shareholders and to oversee the management of the Company's business.  To fulfill its responsibilities and to discharge its duty, the Board of Directors follows the procedures and standards that are set forth in these guidelines. These guidelines are subject to modification from time to time as the Board of Directors deems appropriate in the best interests of the Company or as required by applicable laws and regulations.

47. In violation of the Audit Committee Charter, and their general duties as the members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal control or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational,

15

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

48.     In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Amyris to make false and misleading statements of material fact about the Company's financials and about Amyris's maintenance of adequate internal controls.

49.     Finally, each of the Individual Defendants further owed to Amyris and its shareholders the duty of loyalty requiring that each favor Amyris's interest and that of its shareholders over their own while conducting the affairs the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### COMPANY BACKGROUND

50.     Amyris is an industrial biotechnology company that focuses on research, development, and production of pure, sustainable ingredients for the Health & Wellness, Clean Beauty, and Flavors & Fragrances markets.

51.     The Company uses its proprietary technology platform to engineer and produce organisms.  Amyris combines these organisms with sugarcane in a fermentation process to create large volume, high-value molecules for specialty ingredients.  Amyris touts that its biotechnology platform and fermentation process is a more sustainable and economic alternative to existing manufacturing processes.  Further, the Company believes that "industrial synthetic biology represents a third industrial revolution, bringing together biology and engineering to generate new, more sustainable materials to

1   meet the growing global demand for bio-based replacements for petroleum-based and traditional animal
2   - or plant-derived ingredients."

3       52.    In 2014, the Company successfully commercialized its brand of renewable farnesene, a
4   key intermediate chemical made from sugar that the Company manufactures through fermentation
5   using its engineered microbes.  Farnesene was Amyris's first revenue-generating molecule, the
6   derivatives of which are sold in hundreds of products as solvents, fragrances, skincare products,
7   polymers, and lubricant ingredients.  To produce farnesene and future molecules, Amyris built a
8   production facility in Brazil known as "Brotas 1."

9   **THE COMPANY'S AGREEMENT WITH NENTER & CO., INC.**

10      53.    In 2016, the Company entered into a farnesene supply agreement with Nenter & Co.,
11  Inc. ("Nenter") (the "Nenter Supply Agreement").  Under the Nenter Supply Agreement, Nenter is
12  required to purchase minimum farnesene quantities and make royalty payments to the Company
13  representing a portion of Nenter's profit on the sale of products produced using Amyris's farnesene.
14  Nenter has been one of Amyris's largest customers, representing approximately 10% of Amyris's
15  revenue in 2017.

16      54.    On December 28, 2017, the Company sold Brotas 1 and Amyris Brasil, the subsidiary
17  operating the facility, to a Dutch company called Koninklijke DSM N.V. ("DSM") for $57 million.
18  DSM, a life and materials science giant, and Amyris began working together since May 2017. In May
19  2017, DSM made an equity investment in Amyris, and they have since entered into collaborative
20  development agreements.

21      55.    In connection with the sale, DSM and Amyris entered into a license agreement and
22  royalty agreement.  The Company licensed the use of farnesene in the Vitamin E, lubricant, and flavor
23  and fragrance markets to DSM for a nonrefundable fee of $27.5 million.  In addition, the Company
24  assigned the Nenter Supply Agreement to DSM.  Pursuant to this assignment agreement, DSM agreed
25  to pay Amyris a portion of the profits realized by Nenter and paid to DSM.  At closing, DSM paid
26  Amyris a nonrefundable royalty payment of $15 million, and further agreed to minimum royalties
27  totaling $33 million for 2018, 2019, and 2020, the first three years of the renewable agreement.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF
SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF
CORPORATE ASSETS, AND UNJUST ENRICHMENT

**THE INDIVIDUAL DEFENDANTS' MISAPPLICATION OF ASC 606**

56.     Hoping to find ways to inflate their financial outlook, the Individual Defendants took a new rule issued by the Financial Accounting Standards Board in accounting for license and royalty payments. The new rule, Accounting Standard Codification Topic 606 ("ASC 606"), *Revenue From Contracts with Customers*, provides guidance on how and when to recognize revenue from customers. ASC 606 became effective on January 1, 2018.

57.     Generally, ASC 606 permits businesses to recognize revenue once they have fulfilled all their performance obligations, rather than upon receipt of payment.  For instance, a business may recognize revenue when it delivers a good, provided delivery is its final performance obligation.

58.     The application of ASC 606, however, is not as straightforward when the underlying transaction is not as simple as a product or service for money transactions.

59.     For example, ASC 606-10-32-11 provides specific constraints on the recognition of variable consideration and states that:

> An entity shall include in the transaction price some or all of an amount of variable consideration estimated . . . **only to the extent that it is probable that a significant reversal** in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

60.     ASC 606-10-32-12 provides additional guidance:
> In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

> a. The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

> b. The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

> c. The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

> d. The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

> e. The contract has a larger number and broad range of possible consideration amounts.

18

61.     Based on the guidance, ASC 606 could be applied to recognize sales-based royalty revenue under two circumstances: (1) when the subsequent sale occurs (in the event that the IP license is the predominant item) or (2) only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved (in the event that the IP license is not the predominant item.

62.     As described above, Amyris licenses farnesene to DSM, who then supplies the ingredient to Nenter.  Nenter then uses the farnesene to produce Vitamin E products to sell to consumers.  Amyris and DSM share royalties on Nenter's profits from these product sales.  However, rather than record royalty revenue when Nenter sells Vitamin E products and actually makes a profit, Amyris instead recognized revenue when DSM sold farnesene to Nenter.

63.     Essentially, the Company applied ASC 606 to estimate royalties created two steps removed from its part in the value creation chain, despite the fact that it was virtually impossible to accurately estimate amounts it was owed because the Company's royalties are dependent on Nenter's profit at a later date.

64.     Despite the utterly speculative nature of hypothesizing the royalty revenue two steps removed, the Individual Defendants portrayed that they were able to accurately estimate using complex, probability-based variables. Nevertheless, the Individual Defendants' estimations grossly overstated the royalty revenue due from DSM.

65.     The Individual Defendants wasted no time using ASC 606 to pump up the Company's reported revenue and give Amyris the appearance of growth.  In the first quarter of 2018, the Company reported license and royalty revenue of $11.43 million, nearly half the Company's total revenue of $22.99 million, which represented a 77% growth from the previous year's first quarter.

66.     The Individual Defendants' application of ASC 606 gave the appearance of explosive growth, reporting year-over-year revenue growth of 19% in the first half of 2018.

67.     The Individual Defendants either knew or recklessly ignored that the reported growth resulted from overestimating future royalty payments.   Nevertheless, the Individual Defendants claimed the growth was sustainable and indicative of the performance of the Company's products.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

68.     The Individual Defendants also claimed that a "very strong year" was ahead, with expected revenue of between $185 million and $195 million for 2018.  Defendant Melo further claimed investors could expect between $50 million and $60 million of license and royalty revenue for the year.

69.     By the end of the second quarter, June 30, 2018, Amyris reported total revenue of $46.19 million, including license and royalty revenue of $18.32 million.   These figures were wildly exaggerated given that without ASC 606, Amyris would have only been able to report $2.6 million in license and royalty revenue, the amount that it had actually received from DSM by the end of the second quarter.

70.     Even though Amyris was not receiving substantial royalty payments from DSM via Nenter, and even though they had no way to accurately predict these future payments, the Individual Defendants still claimed that royalty revenues would increase over the second half of the year and into the following year.

71.     For the third quarter, Amyris reported total revenue of $14.86 million and license and royalty revenue of only $142,000.  Amyris's weak third quarter results disappointed its investors, who were led to expect a strong year from Amyris with increased revenue, particularly license and royalty revenue.  Defendant Melo once again painted a rosy picture for 2018, assuring investors that the revenue shortfall would be "made up" through year end.

72.     Such would not be the case.  On March 18, 2019, Amyris issued a press release announcing fourth quarter revenue of $19.4 million and license and royalty revenue of $1.2 million. The press release further disclosed fiscal 2018 revenue of just $80.4 million, missing the Individual Defendants' revenue guidance for the year by 58%.

73.     One day later, the Company announced that it would be unable to timely file its Annual Report for 2018 due to "the significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with [DSM]."

74.     Less than a month later, the Individual Defendants announced that Amyris was restating its fiscal 2018 results to reduce revenue by at least another $12 million and increase net loss by at least $7 million, explaining that "a material error was made related to the estimates for recognizing revenue for royalty payments."

75.     On May 16, 2019, the Company announced additional restatements required for fiscal year 2017, which also resulted from material accounting errors.  In particular, Amyris revealed the Individual Defendants failed to record between $17 million and $19 million as either a liability or charge to the Company's consolidated statement of operations.  These material errors were unearthed as Amyris prepared its untimely Annual Report for 2018.

76.     Needless to say, the revelation of the Individual Defendants' wrongdoing had a profound effect on Amyris's stock price.  On March 15, 2018, the first day of the Relevant Period, Amyris's stock was trading at $5.58 a share.  The false and misleading statements of the Individual Defendants continually pushed the stock price higher, reaching a peak of $9.20 on October 9, 2018.  As news of the Individual Defendants' wrongdoing came to light, the Company's stock price began to crater, dropping to $3.10 on March 20, 2019 and eventually going as low as $1.88 on March 26, 2019.  The stock price has never completely recovered to the price levels seen before the start of the Relevant Period, and certainly nowhere near the price levels reached while the Individual Defendants were releasing their false and misleading statements.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY
TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

77.     As detailed below, during the Relevant Period, the Individual Defendants repeatedly boasted about the Company's financial prospects and growth while also emphasizing expectations of increased royalty revenue.  The Individual Defendants also routinely claimed full disclosure of any material weaknesses or changes in the Company's internal controls.  As would later be revealed, these statements were at best inaccurate, and at worst deceitful.  In truth, Amyris operated with an undisclosed material weakness in financial controls and grossly overestimated reported royalty revenue throughout the Relevant Period.

78.     On March 15, 2018, Amyris issued a press release titled, "Amyris Reports Another Strong Quarter with Solid Operating Performance and 2017 Revenue of $143.3 Million up 113% over 2016."  In the press release, Amyris reported fiscal year 2017 revenue of $143.4 million, compared to $67.2 million for 2016.  The Company also announced revenue of $80.6 million for the fourth quarter

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

of 2017.   Amyris explained these results were "primarily due to the DMS transaction," which contributed $57 million.

79.    In the press release, the Individual Defendants led investors to believe that Amyris would grow and deliver positive results in 2018.  The press release stated that the Company expects revenue "of approximately $185-$195 million . . . for 2018."  Defendant Melo commented on these results in the press release, further leading investors to expect "another very strong year."  Specifically, defendant Melo stated:

> We've completed another record year and a very strong fourth quarter.  We've exceeded our key targets for 2017 and have started 2018 with continued strong growth in revenues and operating performance. . . .  We have completed the transformation of our company into one of the leading global companies focused on making our planet healthier.  We have organized around three core markets—Performance Health and Wellness, Clean Skin-Care and Pure Flavor & Fragrance Ingredients.  Each of these markets is delivering strong, profitable growth underpinned by the most advantaged technology in the sector.  We are making good for humanity and our planet with No Compromise® products.  We are very pleased with our performance and *expect another very strong year* delivering continued market disruption with our partners.

(Emphasis added).

80.    On the same day, Amyris held a conference call with analysts and investors to discuss the results disclosed in the press release.  During the call, defendant Melo characterized the DSM transaction as strategic and transformative.  Defendant Melo stated:

> A) MELO: Let me start with our core markets and **how we are simplifying our reporting.**  Our business is focused on 3 core markets: Performance Health and Wellness; Clean Skin-Care; Flavor & Fragrance Pure Ingredients (sic) [Pure Flavor & Fragrance Ingredients]. . . . **[T]hese are markets where our No Compromise promise, this means products that perform better, are lower cost and competitively priced, is taking significant share and enabling very strong profitable growth for Amyris, where we see this growth continuing for the next 3 to 5 years.**

81.    Although Amyris recorded royalty revenues based on uncertain estimates of future payments, during the call, Defendant Melo also incorrectly portrayed recorded royalty revenues as amounts already provided to Amyris, stating that royalty revenue "represents the revenue we receive."  In particular, defendant Melo and Valiasek stated:

> A) MELO: In addition to making our core markets clear to you, **we are also simplifying how we talk about our business model and how we report our results.**  We've been explaining the value share part of our business model to you and have been blending this into our product revenue line.  **This has become very material faster than we**

22

**expected, and we will now be reported -- reporting separately and labeling these as license and royalties.** When you see this line in our GAAP results, this is mostly value share and **represents the revenue we receive from partners as our share of the value we create when our customers and partners use our product in their formulations. This is a good indicator of the level of disruption our technology is enabling.**

B) MELO: So to summarize. Going forward, when you see royalties and licenses, this is where we will report our value share payments. Product revenue will not include value share. This will keep the product revenue and product direct cost of goods clean and near breakeven and the gross margin from products or what we see as our value share reported as a royalty. **Think of royalties as 100% gross margin.** Think of products having the fully loaded cost of goods for those products.

*     *     *

MELO: We are expecting continuous strong growth through 2022 and beyond, and **have this well underpinned by customer agreements in each of our core markets. We are expecting continued strong expansion of our gross margin into 2018 as a result of product mix and the full impact of our strategic partnership with DSM.**

*     *     *

MELO: **2018 is starting off very well with very strong gross operating performance and revenue that will be around double the first quarter of 2017.**

*     *     *

AMIT DAYAL: A really strong quarter and the guidance is looking really good as well. Kathy, did you mention in your prepared statements that **you're expecting gross margins of around 70% in 2018?** Just wanted to double check if I had that number right.

VALIASEK: **Yes. Yes, that's correct.**

AMIT DAYAL: Perfect. **And is this mostly supported by licenses and royalty revenues, you believe?**

VALIASEK: So what I would -- **primarily, the answer to that question is yes.**

MELO: I mean, I think, just to emphasize that, and I want to do that because of the language change, right. I know we're now using licenses and royalties. In the past, it was value share. **So you could think of what's happening in '18 as predominantly value share affecting that gross margin. But it will be reported and categorized as royalties and licenses, and it's the royalty piece/value share that drives a lot of that gross margin performance.**

C) MELO: Now let me review our outlook for 2018. We have proven our ability to grow. We have now transitioned our business to **profitable growth with very strong gross margin performance in 2017 and beyond.** We expect our revenue pattern through each quarter of 2018 to be largely consistent with prior years. As a result, the first quarter will start off sequentially lower and **2018 is anticipated to be back-half loaded as before,** with the sales growth of our sweetener project, a new flavor ingredient, the batch production and sale of our fragrance ingredients, the established base, as well as the expected close of several new collaborations in the fourth quarter.

To give you more granularity, **we expect that roughly 1/3 of our 2018 revenue will be delivered in the first half, with the remaining 2/3 coming in the second half and more of it in the fourth quarter versus the third quarter.**

**For 2018, we anticipate revenue of approximately $185 million to $195 million. Gross margin on a blended basis across all 4 quarters is expected to average above 70%,** with high marks anticipated in the first half of this year and then some moderation in the second half due to planned expenses associated with launching several of our new products. We expect EBITDA of positive $10 million or better in 2018 and to be net income positive in 2019.

(Emphasis added).

82.     On April 2, 2018, the Company filed a Notification of Late Filing with the SEC on Form 12b-25, announcing that it was unable to timely file its Annual Report for 2017.  Amyris explained its tardiness was due to both the "significant time and resources that were devoted to the accounting for and disclosure of [the DSM transaction]" as well as assessing the impact of ASC 606 on its disclosures. The Company also announced that the material weakness in its internal control over financial reporting, which the Company had previously disclosed on November 20, 2017, "remains unremediated . . . ." The Company's Notification of Late Filing stated in pertinent part:

Amyris, Inc. (the "Company") was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "Form 10-K") within the prescribed time period without unreasonable effort and expense because of the significant time and resources that were devoted to the accounting for and disclosure of the significant transaction with Koninklijke DSM N.V. that closed on December 28, 2017.  The Company is also continuing to assess, compile and obtain information relating to its cash flows for the coming year and is finalizing related analyses and disclosures in the Form 10-K and is completing its evaluation of the impact of the adoption of ASC 606, *Revenue from Contracts with Customers*, in 2018 and related disclosure.  These activities delayed the completion of the Form 10-K.

As previously reported in the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2017, the Company identified a material weakness in internal control over financial reporting related to a lack of sufficient resources in its financial reporting function to be able to adequately identify, record and disclose nonroutine transactions which remains unremediated at December 31, 2017.  The Company is in the process of completing its evaluation of internal control over financial reporting.

83.     On April 17, 2018, the Company belatedly filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Melo, Valiasek, Duyk, Doerr, Piwnica, Al Thani, Williams, Yang, Vuillez, Eykerman, Goppelsroeder, Kung, and Reinach signed the 2017 Form 10-K.  The 2017 Form 10-K reiterates substantially the same results

announced in the March 15, 2018 press release, discussed above.  Additionally, the 2017 Form 10-K discloses DSM's contribution of $57.97 million in license and royalty revenue.  The 2017 Form 10-K also reveals that Nenter was the Company's third-largest customer, contributing $2.6 million in license and royalty revenue.

84.     The 2017 Form 10-K reported total liabilities of $346.1 million and net loss attributable to the Company's common stockholders of $93.3 million.  In addition, the 2017 Form 10-K reported the Company's liabilities and debt resulting from contractual and creditor agreements.  Of those included Amyris's payment obligations to Ginkgo Bioworks, Inc. ("Ginkgo").  The 2017 Form 10-K reported net debt from Ginkgo notes of $7.01 million.

85.     In addition, the 2017 Form 10-K disclosed several material weaknesses that resulted in material misstatements:

> Management, under the supervision of our CEO and CFO, and oversight of the Board of Directors, conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2017, based on the criteria set forth in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).   Based on this assessment, management has identified the material weakness described below:
>
> • The Company's control environment was not effective because the Company lacked a sufficient number of trained resources with assigned responsibility and accountability over the design and operation of internal controls related to complex, significant non-routine transactions as well as routine transactions and financial statement presentation and disclosure;
>
> • The Company did not have an effective risk assessment process to identify and analyze necessary changes in significant accounting policies and practices that were responsive to: (i) changes in business operations resulting from complex significant non-routine transactions, (ii) implementation of new accounting standards and related disclosures, and (iii) completeness and adequacy of required disclosures; and
>
> • The Company did not have an effective information and communication process to ensure that the processes and controls were effectively documented and disseminated to enable financial personnel to effectively carry out their roles and responsibilities.
>
> As a consequence, the Company did not have effective process level control activities over the following:
>
> • The Company did not adequately design and document controls over complex, significant non-routine transactions that included various financing arrangements and a business divestiture, all which involved multiple components including revenue elements; and

25

- The Company's controls over account reconciliations, review and approval of manual journal entries, and timely and complete financial statement presentation and disclosure did not operate effectively

The material weakness described above resulted in material misstatements in the gain or loss on extinguishment, gain or loss from change in fair value of derivative liabilities, derivative liabilities, collaboration revenue, and additional paid-in capital in the preliminary consolidated financial statements that were corrected prior to the issuance of the consolidated financial statements as of and for the year ended December 31, 2017. However, the material weakness creates a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. Therefore, we concluded that our internal control over financial reporting is not effective as of December 31, 2017.

86.     However, the Individual Defendants, much like defendant Melo's false reassurances in connection with the Company's revenue numbers, claimed that Amyris expected to resolve the material weaknesses and had a remediation plan in place to do so. Specifically, the 2017 Form 10-K stated:

***Remediation Plan***

We are addressing the identified material weakness by taking the following actions:

- Augmenting our accounting staff with additional personnel, as well as evaluating our personnel in key accounting positions;

- Documenting and augmenting key policies and internal control procedures to strengthen our identification of and accounting for complex, significant nonroutine transactions and routine transactions; and

- Implementing a program for training of internal staff members covering: (i) the Company's accounting policies and procedures, (ii) roles and responsibilities of the Company's finance department, and (iii) new and existing financial accounting issues.

Management believes that the foregoing efforts will effectively remediate the material weakness. As we continue to evaluate and work to improve our internal control over financial reporting, management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above.

87.     The 2017 Form 10-K contained defendants Melo's and Valiasek's signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the report. The certifications of defendants Melo and Valiasek acknowledged their responsibility "establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for [Amyris]" and falsely stated that they had:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

88.     Defendants Melo and Valiasek also falsely certified that they had disclosed any deficiencies and material weaknesses in the Company's internal controls, including:

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

89.     On May 14, 2018, Amyris issued a press release titled, "Amyris Continues Strong Momentum and Execution with 77% Revenue Growth and Exceeds Gross Margin Target."  In the press release, Amyris reported revenue of $23 million for the first quarter of 2018, compared with $13 million in the first quarter of 2017.  The Company further announced over $11 million in royalty payments for the first quarter of 2018, explaining, "[o]ur product related royalty revenue (previously referred to as value share) delivered $11.4 million of 100% gross margin related revenue."

90.     On the same day, the Company held an earnings conference call with analysts and investors to discuss the results outlined in the press release.  During the call, defendant Melo claimed increased royalty revenues was indicative of the performance of Amyris's products, suggesting that the Company was actually receiving royalty profits from product sales rather than overestimating future amounts due from DSM.  In particular, defendant Melo stated:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Our royalty payments, which we used to call value share from products delivered was $11.4 million in the first quarter versus $225,000 for the same period last year. ***This is a strong indication of the underlying performance of our products in their respective end markets and the sustainability of our differentiated and advantaged business model***.

(Emphasis added).

91.     During the question and answer session of the call, an analyst asked whether the $11.4 million of royalty revenue would be steady throughout the year.  In response, defendant Melo falsely assured the analyst could expect $50-$60 million in royalty revenue for the year, despite "some choppiness."  The transcript of their conversation is provided as follows:

**Amit Dayal** – *H.C. Wainwright & Co, LLC, Research Division – MD of Equity Research & Senior Technology Analyst*

One of my questions is around the royalty and licenses side.  Is the $11.4 million, all of it royalties for the quarter?  Or are there any license fees in it, too?

**[Defendant Melo]**

Amit, first of all, thank you for being on the call and thank you for the question.  Just about all of it is royalty or what we used to call value share.  So there is no license revenue in the quarter.

**[Amit Dayal]**

Understood.  And how should we sort of look into these royalty revenues going forward?  Will this kind of be steady state at this type of level or will there be some variances depending on the end-market sales?

**[Defendant Melo]**

Yes.  I mean, the way I would look at it, I think what we said in the last call is that we would generate around ***$50 million to $60 million*** of value share for the year, and that is the royalty line.  ***And that's what you should expect***.  It won't be perfectly linear for the year, so you'll see some choppiness.  But again, for the full year, $50 million to $60 million, I'd expect some choppiness, but full year strong flows.  No change.

(Emphasis added).

92.     On May 16, 2018, Amyris filed another Notification of Late Filing on Form 12b-25 with the SEC announcing the Company was unable to file its Quarterly Report for the first quarter of 2018 within the prescribed time period.  The Company explained this was "because of the significant time and resources that were devoted to the accounting for a disclosure of the adoption of ASC 606 . . . ."  Amyris further reported the Company was engaged in ongoing remediation efforts to resolve its

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

previously disclosed material weaknesses in internal controls, including the hiring of experienced personnel.

93.     On May 18, 2018, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 ("the Q1 2018 Form 10-Q") with the SEC.  The Q1 2018 Form 10-Q reported total revenue of $22.99 million and license and royalty revenue of $11.4 million, numbers almost directly on par with its May 14, 2018 press release.

94.     In addition, the Q1 2018 Form 10-Q stated that the Company had not yet remediated its material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K.  The Q1 2018 Form 10-Q also stated, "[o]therwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting."  The Q1 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.  These certifications pursuant to SOX are the same or substantially similar to those in the 2017 Form 10-K, referenced above.

95.     On May 22, 2018, the Company hosted a presentation called "Amyris, Inc. BioDisrupt 2018," which led the public to anticipate continued revenue growth.  During the presentation, defendant Valiasek touted Amyris's results for the first quarter of 2018, claiming further that Amyris's revenue growth was "sustainable" and "year over year amazing."  In addition, defendant Valiasek reiterated the Company's expected revenue of between $185 million and $195 million for 2018 and stated that investors would "see the same thing in 2019."  Specifically, defendant Valiasek stated:

> So again, what are seeing? ***Sustainable growth***.  This is how we get to [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] positive in 2018 and the outer years, Okay. 83% non-GAAP gross margin versus last year same quarter, negative 4%.
>
> And if we look at the adjusted EBITDA for the quarter versus last year, 26% improvement.  One of the important pieces that I wanted to note today is last year versus this year, we had a lot of one-time cost in 2018 first quarter, some of which are related to ASC 606, some of which are related to the closing of our transaction in Q4 2018, which closed on December 28th.  And so a lot of the costs that we incurred rolls over into Q1 2018.  And we also some product development cost which also contributed to that $6 million in one-time cost.

29

But if you take out of our run rate from Q1 2018, that $6 million where it's almost at the exact same run rate we were at for Q4 2017.  So a lot of investors and analysts are saying to me, Okay, well the information that you're giving me, we're doing the math, we've said our EBITDA will be $10 million positive.  If we do the math, you're going to be even more than that.  But what we wanted to do consistently is be conservative, make sure that we meet our numbers.

Here's our revenue growth.  It's again, year over year amazing.  ***We're expecting to do 185 to 195 in 2018***.  Again, gross margin at least 70% for 2018.  And you'll see the same thing in 2019.

(Emphasis added).

96.     During the same presentation, defendant Melo declared Amyris's royalty revenue would significantly increase during the second half of 2018 and continue to increase thereafter.  However, defendant Melo ignored the inherent uncertainty of estimating royalty revenue and instead stated, "[t]he math is pretty simple."  Specifically, defendant Melo stated:

The next segment is health and wellness.  And health and wellness has three specific drivers of growth that are all contracted and all part of our business today.  The first is DSM has a value share/royalty agreement with us for our current vitamin, and also for the vitamin we plan on introducing.

What I don't think we've made very clear is that the rate, ***the percentage of that royalty increases significantly over the second half of this year and into next year and the year after***.

***The math is pretty simple***.  We started the first half of this year with about a 25% value share.  We end the year at a 35% value share.  And we go into next year and the following year with a 45% value share.

Without much change to our base business, the share we get of the margin in Vitamin E or the ***royalty payment is significantly greater going into the second half and going into 2019 and 2020***.

(Emphasis added).

97.     On August 6, 2018, Amyris issued a press release titled, "Amyris Delivers Another Quarter of Profitable Growth While Executing Well on Strategic Agenda."  The press release disclosed total revenue of $24.8 million for the second quarter of 2018.  Defendant Melo commented on the second quarter's positive results, stating they are a "demonstration that our focus on profitable growth is yielding results."

98.     On the same day, the Company held a conference call with analysts and investors to discuss the Company's second quarter results.  During the call, the Individual Defendants perpetuated false expectations of strong financial results for the remaining half of 2018.  In his opening statement,

defendant Melo falsely attributed Amyris's revenue growth to "strong demand."  Defendant Melo also claimed royalty revenue was "continuing to do well," even though Amyris had received only $2.6 million from DSM by the end of the second quarter, the amount the Company would have reported without ASC 606.  Defendant Melo stated in pertinent part:

> Let me start with our business performance.  We delivered 8% revenue growth over the first quarter of 2018 and 15% growth over the second quarter of 2017 when you adjust for the Vitamin E product sales that are now produced and supplied by DSM, no longer supplied or in the Amyris portfolio.
>
> ***Our first half of 2018 revenue is 48% better than the first half of 2017 when adjusting our Vitamin E contract sold to DSM***.  This like-for-like improvement is a great example of the ***strong demand*** we are experiencing within our core product portfolio and a great testament to the strength of our strategy of focusing on the health and beauty markets and the simplification of our business model and product portfolio.
>
> In addition to the strong top line performance, our gross margins and adjusted EBITDA are also much improved over 2017.  Our adjusted EBITDA is $4.7 million better in the second quarter of 2018 versus 2017, and our first half 2018 is $9.7 million better.  Our gross profit has also improved significantly from the first half of 2017.  First half of 2017, we had 19% non-GAAP gross margin.  In the first half of 2018, we are at 84% non-GAAP gross margin, the second quarter also at the 84% gross margin level.
>
> We delivered most of this first half performance on the back of our Clean Beauty business, the value share/royalty payments and collaborations.  Most of our ingredient shipments, all of our sweetener revenue and our new collaborations are expected in the second half of 2018.  This is consistent with our business model of producing the ingredients we sell in single annual batches, and the phasing of our new collaboration agreements are also consistent with last year, predominantly in the second half of the year.  All of the expected revenue for this year is either contracted or in the final contract phase.
>
> ***Our royalty/value share is continuing to do well***, and our Clean Beauty business is growing faster than we expected.

(Emphasis added).

99.     However, defendant Melo changed course from his previous claim that investors could expect royalty revenue of between $50 million and $60 million in 2018, stating that only $10 million to $15 million of royalty revenues were expected for the second half of the year.  During the call, he conceded that Amyris's royalty revenue depended upon the Vitamin E market's volatility and Nenter's sales.  However, rather than reduce the Company's estimated 2018 revenue, defendant Melo instead stated that Amyris expected ambitious revenue of at least $135 million for the second half of 2018.  Despite the admitted volatility of the Vitamin E market, defendant Melo assured investors that the Individual Defendants "have been very effective at predicting market prices to date."  Defendant Melo

31

stated:

> The only area of our business that we have no control over is our Vitamin E royalty.  In this activity, DSM is now responsible for the supply, and we are purely a receiver of value share or royalty based on market price and of volumes sold by Nenter.  ***This is a very volatile market, and we have no control over the price Nenter sells into this market.  These royalties represent between $10 million and $15 million of expected second half performance, and that is built within the $135 million to $145 million of expected second half revenue.  We have been very effective at predicting market prices to date . . . .***

(Emphasis added).

100.    On August 14, 2018, the Company filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2018 (the Q2 2018 Form 10-Q").  In the Q2 2018 Form 10- Q, Amyris lowered its previously disclosed second quarter revenue of $24.8 million to $23.19 million.  The Q2 2018 Form 10-Q further announced license and royalty revenue of $6.88 million for the second quarter.

101.    In addition, the Q2 2018 Form 10-Q once again stated that the Company had yet to remediate its material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K.  The Q2 2018 Form 10-Q stated, "Otherwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting." The Q2 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls. These certifications pursuant to SOX are the same or substantially similar to those in the 2017 Form 10-K, referenced above.

102.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) that the Individual Defendants were misusing ASC 606 and were unable estimate royalty revenue on certain transactions; (ii) that the reported licensing and royalty revenues were overestimated; (iii) that Amyris would need to restate financial statements; (iv) that there was an undisclosed material weakness in Amyris's internal controls; and (v) as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper.

**THE TRUTH IS SLOWLY REVEALED**

103. On November 13, 2018, Amyris issued a press release announcing disappointing results for the third quarter of 2018. The press release revealed that licensing and royalty revenues, which had been driving the Company's reported growth, dropped from $18.3 million in the first half of 2018 to just $142,000 in the third quarter.

104. Rather than acknowledge the Individual Defendants' misuse of ASC 606, defendant Melo attributed the poor results to the "volatility of the Vitamin E market." Even though he either knew or should have known that these weak trends would continue into the fourth quarter, defendant Melo falsely assured that the shortfall would be "made up with our core market revenue performance through year end." The press release stated, in relevant part:

- Q3 2018 GAAP revenue of $14.9 million, compared with GAAP revenue of $24.2 million for Q3 2017. Third-quarter revenue of $14.9 million compared with the same period in 2017 of $22.5 million when adjusted for the loss making product sales on contracts assigned to DSM.

- Q3 2018 Adjusted gross margin of $8.2 million, or 55% of revenue, compared to Q3 of 2017 of $8.3 million, or 34%.

- Current quarter delivering at $200 million of annualized recurring revenue rate* with over 60% gross margin. Doubling recurring revenue year on year while tripling adjusted gross margin dollars.

*      *      *

EMERYVILLE, Calif., Nov. 13, 2018 (GLOBE NEWSWIRE) -- Amyris, Inc. (Nasdaq: AMRS), the industrial bioscience company, today announced preliminary unaudited financial results for the third quarter ended September 30, 2018. "We are pleased with the rapid ramp up of our new, zero calorie sweetener product and our continued strong recurring revenue growth," said John Melo, President and CEO of Amyris. "However, *we are very disappointed with the volatility of the Vitamin E market and its direct impact on our third quarter revenue. Some of this shortfall is expected be made up with our core market revenue performance through year end*."

Continued Melo, "*While the unpredictable nature of the Vitamin E market and our royalty is disappointing*, we are very pleased by the strong growth of our Clean Beauty business, the early demand for our zero calorie sweetener and for the better than planned growth of our ingredients business. Our recurring revenue has been doubling year on year and we are on pace to deliver for the fourth quarter at an annualized rate of about $200 million in recurring revenue. This is double what we did in recurring revenue for the fourth quarter of last year and a great testament to the quality of our product portfolio and of our partnerships where we are delivering strong results. We are achieving this revenue growth from our product sales and long term partnerships while delivering three times the gross margin dollars year to date 2018 versus 2017 at this time. We expect strong continued recurring revenue growth where we control our destiny while delivering industry leading gross profit."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

*(product and collaboration revenue connected to three-year agreements or 10 year supply relationships)

(Emphasis added).

105.    On the same day, Amyris held a conference call with analysts and investors to discuss the Company's third quarter results.  In his opening statement, defendant Melo ignored the Individual Defendants' responsibility to properly account for royalty revenue due from Nenter via DSM.  In contravention of their fiduciary duties, the Individual Defendants had control over these estimations and should have limited these figures to honestly represent what the Company realistically would be receiving in order to prevent misleading and disappointing Amyris's investors.

106.    Instead, defendant Melo blamed the disappointment stemming from the poor results on "the Vitamin E royalty aspect of our business, an activity outside of [their] control."  Further, despite routinely leading the public to anticipate a strong year, with repeated assurances of continued increases in license and royalty revenues, defendant Melo falsely professed the Individual Defendants "continued execution on the promises [that] we've made to you."  Specifically, defendant Melo stated:

Our third quarter results were disappointing.  ***We delivered strong results from the activities we controlled, with continued execution on the promises we've made to you, and very poor results from the Vitamin E royalty aspect of our business, an activity outside of our control***.

*      *      *

Since the start of 2018, we have had no direct involvement in the Vitamin E business.  Short-term oversupply and selling price is the issue and a direct impact on our royalty revenue.  We expected around $15 million of royalty revenue in the third quarter and realized 0.

(Emphasis added).

107.    On November 15, 2018, the Company filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q").  The Q3 2018 Form 10-Q confirmed the disappointing results previously announced by Amyris.  The Company reported revenue of $14.86 million and net loss of $68.32 million.  The Q3 2018 Form 10-Q reported license and royalty revenue of $18.46 million for the nine months ended September 30, 2018.  However, without ASC 606,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

the Q3 2018 Form 10-Q revealed, that the Company's license and royalty revenue figure amounts to only $4.37 million.

108.    In addition, the Q3 2018 Form 10-Q stated that the Company had not yet remediated its material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K.  The Q3 2018 Form 10-Q falsely stated, "Otherwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting." The Q3 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.

109.    On March 18, 2019 the Company filed a Form 8-K which included the Company's press release issued the same day announcing Amyris's financial results for the fourth quarter and fiscal year ended December 31, 2018.  The press release announced fourth quarter revenue of $19.4 million and license and royalty revenue of $1.2 million.  For fiscal year 2018, the press release disclosed revenue of $80.4 million.  Thus, the press release revealed that Individual Defendants missed their fiscal 2018 revenue guidance by 58%.

110.    In the press release, defendant Melo noted that the "results for the quarter and year are below expectations."  Rather than acknowledging the Individual Defendants' responsibility for failing to meet stated expectations, defendant Melo blamed the negative results on the Assignment Agreement, a last minute deal made on the final day of the year, falling through.  Defendant Melo stated, "The negative results for the quarter and full year reflect the inability to recognize revenue for a $50 million multiparty Vitamin E deal in China during the fourth quarter."

111.    Regardless, of the financial disaster 2018 had turned into for Amyris, on February 22, 2019, the Individual Defendants brazenly awarded cash bonuses to the Company's named executive officers ("NEOs") based on Amyris's performance for the year.  Specifically, the Company's Leadership Development and Compensation Committee approved "cash bonus awards for the Company's [2018 fiscal year] to the NEOs, which included a cash bonus award to [defendant Melo] in the amount of $224,280."

112.     On March 19, 2019, the Company filed yet another Notification of Late Filing on Form 12b-25 with the SEC.  The Form 12b-25 stated:

> Amyris, Inc. (the "Company") was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "Form 10-K") within the prescribed time period without unreasonable effort and expense *because of the significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with Koninklijke DSM N.V. that closed in November 2018.  The Company is also in the process of completing its evaluation of internal control over financial reporting for 2018 and finalizing related disclosures in the Form 10-K*. These activities delayed the completion of the Form 10-K.
>
> As previously reported in Part II, Item 9A, "Controls and Procedures" of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, the Company has identified a *material weakness in its internal control* over financial reporting, which material weakness *remains unremediated* as of December 31, 2018. The Company is in the process of completing its evaluation of internal control over financial reporting and may have further deficiencies to report. In addition, the Company expects to continue to report that there is substantial doubt about its ability to continue as a going concern.

(Emphasis added).

113.     On April 11, 2019, Amyris filed a Current Report on Form 8-K announcing that the Company would need to restate its previous financial statements.  The Form 8-K revealed that the previously disclosed fiscal 2018 revenue of $80.4 million, which so woefully missed the Individual Defendants' projections, would be reduced by at least another $12 million.  In addition, the Form 8-K warned investors that they "should no longer rely upon" the Company's Quarterly Reports on Forms 10-Q for the first, second, and third quarters of 2018, as the financial statements contained therein would also be restated.

114.     The reason for the restatements included several material errors, including an error in estimating royalty revenue under ASC 606.  In the Form 8-K, the Individual Defendants admitted an undisclosed material weakness in the Company's internal controls existed, stating that Amyris "expects to report material weaknesses in addition to the material weaknesses reported in the [2017 Form 10-K]."  The Form 8-K stated, in relevant part:

> During the preparation and audit of the Company's consolidated financial statements for Fiscal 2018, the Company concluded that (i) *a material error was made related to the estimates for recognizing revenue for royalty payments under the Value Sharing Agreement, dated December 28, 2017 (the "Value Sharing Agreement"), as amended between the Company and DSM under Accounting Standards Codification Topic 606 Revenue from Contracts with Customers, for the quarterly and year-to-date period ended March 31, 2018 and June 30, 2018 and year-to-date period ended September*

36

*30, 2018,* (ii) material errors were made related to certain expenses that should have been identified and recorded as accrued liabilities in the fiscal quarter ended September 30, 2018 and (iii) material errors were made related to certain foreign currency transaction gains that should have been identified and recorded as other income in the quarterly and year-to-date periods ended June 30, 2018 and September 30, 2018. As a result, the Company anticipates that the restatement for these material errors and certain other matters will include a reduction in revenue and an increase in net loss for the Non-Reliance Periods as follows: approximately $4 million and $4 million, respectively, for the fiscal quarter ended March 31, 2018; approximately $8 million and $8 million, respectively, for the fiscal quarter ended June 30, 2018; approximately $1 million and $7 million, respectively, for the fiscal quarter ended September 30, 2018; approximately $12 million and $11 million, respectively, for the six months ended June 30, 2018; and approximately $13 million and $18 million, respectively, for the nine months ended September 30, 2018. The estimated impact to the financial statements of the errors could materially change based on further review and analysis of the Non-Reliance Periods, including the identification of additional material errors. ***The Company is in the process of finalizing its evaluation of internal control over financial reporting and expects to report material weaknesses in addition to the material weakness reported in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017. The Company has reached a conclusion that its system of internal control over financial reporting is not effective as of December 31, 2018***.

(Emphasis added).

115.    On April 19, 2019, the Company filed a Current Report on Form 8-K announcing an agreement to assign its royalty interest to DSM, with whom the Company previously shared royalty profits from Nenter. DSM agreed to acquire the royalty agreement from Amyris for $57 million, $29.1 million of which would be paid in cash to Amyris. The remaining $27.9 million would be used to pay off "certain existing obligations of the Company to DSM."

116.    On May 16, 2019, Amyris filed another Current Report on Form 8-K revealing that, in addition to the Company's Quarterly Reports for 2018, investors also should not rely upon the 2017 Form 10-K as the financial statements contained therein also required restatement.

117.    The Form 8-K revealed that the Company's preparation and audit of its Annual Report for 2018 had unearthed additional material accounting errors made in the previous year. Specifically, the Individual Defendants failed to record between $17 million and $19 million as either a liability or charge to its consolidated statements of operations. The Form 8-K stated, in relevant part:

During the preparation and audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2018, ***senior management concluded that a material error had been made related to the accounting for certain payment obligations of the Company under the Partnership Agreement dated October 20, 2017*** (the "***Ginkgo Agreement***"), between the Company and Ginkgo Bioworks, Inc. The contractual payment obligations of the Company under the Ginkgo Agreement and a related promissory note issued in connection therewith total $31.0 million over a five-year period ending on October 19, 2022 and had a present value of approximately $17.0

million to $19.0 million at the October 20, 2017 commitment date. ***A significant portion of these payment obligations had not been recorded as a liability or charged to the consolidated statement of operations as of December 31, 2017***.

On May 14, 2019, as a result of the error discussed above, the Board, upon the recommendation of the Audit Committee after consultation with senior management and KPMG, determined that the Company will restate its audited consolidated financial statements for the year ended December 31, 2017. ***Accordingly, investors should no longer rely upon the Company's previously released consolidated financial statements for the 2017 Non-Reliance Period. In addition, investors should no longer rely upon earnings releases for this period and other communications relating to these consolidated financial statements. Further, the Company's disclosures related to such financial statements and related communications issued by or Company with respect to the 2017 Non-Reliance Period, including management's assessment of internal control over financial reporting as of December 31, 2017, should also no longer be relied upon***. Additionally, as previously reported, the Company expects to report material weaknesses in its internal control over financial reporting as of December 31, 2018. As a result of the material weaknesses, senior management concluded that the Company's internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2018. Additional material weaknesses may be identified, and the scope of financial items or periods required to be restated may be broadened. The Company expects that KPMG will complete its re-audit of fiscal year 2017 when it completes its audit of fiscal year 2018.

(Emphasis added).

118.    Months later, Amyris has neither filed its Annual Report for 2018 nor restated its 2017 Form 10-K or any of its Quarterly Reports for 2018.

119.    On June 4, 2019, Amyris, announced that the Company had appointed Jonathan Wolter to serve as the Company's Interim CFO, and that defendant Valiasek had been reassigned from her role as the Company's CFO to a new role as Chief Business Officer of the Company, effective June 3, 2019.

**DEFENDANTS MELO, DUYK, DOERR, PIWNICA, WILLIAMS, YANG, EYKERMAN, GOPPELSROEDER, KUNG, AL THANI, VUILLEZ, AND REINACH ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD**

120.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach also caused the Company to issue a false and misleading proxy statement during the Relevant Period. Specifically, the Company's 2018 Proxy sought stockholder votes to, *inter alia*: (1) elect the four Class II directors (defendants Eykerman, Kung, Melo, and Williams) nominated by the Company's Board of Directors to serve on the Board for a three-year term (Proposal 1); (2) approve amendments to the Company's 2010 Equity Incentive Plan to (i) increase the number of shares of Amyris common stock available for grant and issuance

thereunder by 9,000,000 shares and (ii) increase the annual per-participant award limit thereunder to 4,000,000 shares (Proposal 3); and (3) approve the issuance to John Melo, the Company's President and Chief Executive Officer, under our 2010 Equity Incentive Plan of (i) a stock option to purchase 3,250,000 shares of Amyris common stock, such award being subject to performance-based vesting conditions as described herein, and (ii) a restricted stock unit award for 700,000 shares of Amyris common stock, such award being subject to time-based vesting in four equal annual installments with an initial vesting date of July 1, 2019 (Proposal 5).

121.   Defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Amyris's stockholders.  Defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach negligently issued materially misleading statements in the 2018 Proxy.  These 2018 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2018 Proxy allegations and related claims.

**MISLEADING PROPOSAL TO REELECT DEFENDANTS MELO, EYKERMAN, KUNG, AND WILLIAMS TO THE BOARD**

122.   In support of defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach's bid to reelect defendants Melo, Eykerman, Kung, and Williams to the Board, these defendants highlighted their supposed oversight of the Company.  In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Amyris faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

**Role of the Board in Risk Oversight**

We consider risk as part of our regular evaluation of business strategy and decisions. Assessing and managing risk is the responsibility of our management, which establishes and maintains risk management processes, including prioritization processes, action

plans and mitigation measures, designed to balance the risk and benefit of opportunities and strategies.   It is management's responsibility to anticipate, identify and communicate risks to the Board and/or its committees.  The Board as a whole oversees our risk management systems and processes, as implemented by management and the Board's committees.   As part of its oversight role, the Board has established an enterprise risk management process that involves management discussions with and updates to members of the Audit Committee regarding enterprise risk prioritization and mitigation.   In addition, the Board uses its committees to assist in its risk oversight function as follows:

- The Audit Committee has responsibility for overseeing our financial controls and risk and legal and regulatory matters.

- The Leadership Development and Compensation Committee is responsible for oversight of risk associated with our compensation programs and plans.

- The Nominating and Governance Committee is responsible for oversight of Board processes and corporate governance related risks.

The Board receives regular reports from committee Chairs regarding the committees' activities.  In addition, discussions with the Board regarding our strategic plans and objectives, business results, financial condition, compensation programs, strategic transactions, and other business discussed with the Board include discussions of the risks associated with the particular item under consideration.

*          *          *

**Corporate Governance Principles**

The Board has adopted written Corporate Governance Principles to provide the Board and its committees with operating principles designed to enhance the effectiveness of the Board and its committees, to establish good Board and committee governance, and to establish the responsibilities of management and the Board in supporting the Board's activities.  The Corporate Governance Principles set forth a framework for Amyris's governance practices, including composition of the Board, director nominee selection, Board membership criteria, director compensation, Board education, meeting responsibilities, access to information and employees, executive sessions of independent directors, standing Board committees and their functions, and responsibilities of management.

**Code of Business Conduct and Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees of Amyris as required by NASDAQ governance rules. Our Code of Business Conduct and Ethics includes a section entitled "Code of Ethics for Chief Executive Officer and Senior Financial Officers," providing additional principles for ethical leadership and a requirement that such individuals foster a culture throughout Amyris that helps ensure the fair and timely reporting of our financial results and condition.  Our Code of Business Conduct and Ethics is available on the corporate governance section of our website at http://investors.amyris.com/corporate-governance.cfm.  Stockholders may also obtain a printed copy of our Code of Business Conduct and Ethics and our Corporate Governance Principles by writing to the Secretary of Amyris at 5885 Hollis Street, Suite 100, Emeryville, California 94608.  If we make any substantive amendments to, or grant any waivers from, a provision of our Code of Business Conduct and Ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing

40

similar functions, we will promptly disclose the nature of the amendment or waiver on the corporate governance section of our website at http://investors.amyris.com/corporate-governance.cfm.

123.    The 2018 Proxy thus assured stockholders that both the Individual Defendants and the Board was involved with Amyris's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, both the Individual Defendants and the Board were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from (i) misusing ASC 606 and to improperly estimate royalty revenue on certain transactions; (ii) overestimating licensing and royalty revenues; (iii) disclosing that Amyris would need to restate financial statements; (iv) disclosing that there was a material weakness in Amyris's internal controls; and (v) making improper representations concerning the Company's financial results, business prospects, and internal controls.

124.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Melo, Eykerman, Kung, and Williams to the Board.

**MISLEADING PROPOSAL TO APPROVE AMENDMENTS TO THE COMPANY'S 2010 EQUITY INCENTIVE PLAN**

125.    The 2018 Proxy repeatedly outlined how executive compensation was based on performance, both individually and on a Company bases:

***Compensation Philosophy and Objectives and Elements of Compensation***

The primary objectives of our executive compensation program in 2017 were to:

- Attract, retain, and motivate highly talented employees that are key to our success;

- Reinforce our core values and foster a sense of ownership, urgency and entrepreneurial spirit;

- ***Link compensation to individual, team, and company performance (as appropriate by employee level)***;

- ***Emphasize performance-based compensation for individuals who can most directly impact stockholder value***; and

- ***Provide exceptional pay for delivering exceptional results***.

\*        \*        \*

41

Our business continues to be in an early stage of development with cash management being one key consideration for our strategy and operations. Accordingly, for 2017, we intended to provide a competitive compensation program that would enable us to attract and retain the top executives and employees necessary to develop our business, while being prudent in the management of our cash and equity. **Based on this approach, we continued to aim to balance and reward annual and long-term performance with a total compensation package that included a mix of both cash and equity.** Our compensation program was intended to align the interests of our executive officers, key employees and stockholders and to drive the creation of stockholder value by providing long-term incentives through equity-based awards. We continued to adhere to this general compensation philosophy for 2017.

Our intent and philosophy in designing compensation packages at the time of hiring of new executives is based on providing compensation that we believe is sufficient to enable us to attract the necessary talent, within prudent limitations as discussed above. **Compensation of our executive officers after the initial period following their hiring is influenced by the amounts of compensation that we initially agreed to pay them, as well as by our evaluation of their subsequent performance, changes in their levels of responsibility, retention considerations, prevailing market conditions, our financial condition and prospects, and our attempt to maintain an appropriate level of internal pay parity in the compensation of existing executive officers relative to the compensation paid to more recently hired executives.**

We compensate our executive officers with a combination of salaries, cash bonuses and equity awards. We believe this combination of cash and equity compensation, subject to strategic allocation among such components, is largely consistent with the forms of compensation provided by other companies with which we compete for executive talent, and, as such, matches the expectations of our executive officers and the market for executive talent. **We also believe that this combination provides appropriate incentive levels to retain our executives, reward them for performance in the short term and induce them to contribute to the creation of value in Amyris over the long term.** We view the different components of our executive compensation program as distinct, each serving particular functions in furthering our compensation philosophy and objectives, and, together, providing a holistic approach to achieving such philosophy and objectives.

**Base Salary.** We believe that we must maintain base salary levels that are sufficiently competitive to position us to attract and retain the executive officers we need and that it is important for our executive officers to perceive that over time they will continue to have the opportunity to earn a salary that they regard as competitive. The Leadership Development and Compensation Committee of our Board (the "LDCC" or the "Committee") reviews and adjusts, as appropriate, the base salaries of our executive officers on an annual basis, and makes decisions with respect to the base salaries of new executives at the time of hire. **In making such determinations, the Committee considers several factors, including our overall financial performance, the individual performance of the executive officer in question (including, for executives other than our CEO, the recommendation of our CEO based on a performance evaluation of the executive officer in question), the executive officer's potential to contribute to our annual and longer-term strategic goals, the executive officer's scope of responsibilities, qualifications and experience, competitive market practices for base salary, prevailing market conditions and internal pay parity.**

**Cash Bonuses. We believe the ability to earn cash bonuses should provide incentives to our executive officers to effectively pursue goals established by our Board and should be regarded by our executive officers as appropriately rewarding**

42

*effective performance against these goals.  For 2017, the LDCC adopted a cash bonus plan for our executive officers, the details of which are described below under "2017 Compensation."  The 2017 cash bonus plan included company performance goals and individual performance goals and was structured to motivate our executive officers to achieve our short-term financial and operational goals and to reward exceptional company and individual performance.  In particular, our 2017 cash bonus plan was designed to provide incentives to our executive officers to achieve 2017 company financial and operational targets on a quarterly and annual basis, together with various key individual operational objectives that were considered for annual performance achievement.*  In general, target bonuses for our executive officers are initially set in their offer letters based on similar factors to those described above with respect to the determination of base salary.  For subsequent years, target bonuses for our executive officers may be adjusted by the LDCC based on various factors, including any modifications to base salary, competitive market practices and the other considerations described above with respect to adjustments in base salary.  *In addition, in 2017 the LDCC granted discretionary cash bonuses to certain of our executive officers in recognition of their exceptional performance, the details of which are described below under "2017 Compensation."*

**Equity Awards.**  Our equity awards are designed to be sufficiently competitive to allow us to attract and retain talented and experienced executives.  In 2017, we granted both stock option and restricted stock unit ("RSU") awards to our executive officers.  Option awards for executive officers are granted with an exercise price equal to the fair market value of our common stock on the date of grant; accordingly, such option awards will have value to our executive officers only if the market price of our common stock increases after the date of grant.  RSU awards represent the right to receive full-value shares of our common stock without payment of any exercise or purchase price.  Shares of our common stock are not issued when a RSU award is granted; instead, once a RSU award vests, one share of our common stock is issued for each vested RSU.  In the past, we generally granted smaller RSU awards as compared to option awards because RSUs have a greater fair value per unit than options.  However, in 2017 we continued a practice that began in 2016 to place a greater emphasis on RSU awards to increase the perceived value of equity awards granted to our executive officers.  The relative weighting between the option and RSU awards granted to our executive officers is based on the LDCC's review of market practices.

(Emphasis added).

126.     Moreover, the 2010 Equity Incentive Plan that the Individual Defendants and the Board sought to amend was also performance driven:

***Equity Awards***

The Amended 2010 EIP permits us to grant the following types of awards:

**Stock Options.**  The Amended 2010 EIP provides for the grant of ISOs and NSOs.  ISOs may be granted only to our employees or employees of our subsidiaries.  NSOs may be granted to employees, officers, non-employee directors, consultants and other independent advisors who provide services to us or any of our subsidiaries.  We are able to issue no more than 2,000,000 shares pursuant to the grant of ISOs under the Amended 2010 EIP.  The LDCC determines the terms of each option award, provided that ISOs are subject to statutory limitations.  The LDCC also determines the exercise price for a stock option, provided that the exercise price of an option may not be less than 100%

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

(or 110% in the case of recipients of ISOs who hold more than 10% of our stock on the option grant date) of the fair market value of our common stock on the date of grant.

Options granted under the Amended 2010 EIP vest at the rate specified by the LDCC and such vesting schedule is set forth in the stock option agreement to which such stock option grant relates. Generally, the LDCC determines the term of stock options granted under the Amended 2010 EIP, up to a term of ten years (or five years in the case of ISOs granted to 10% stockholders).

After the option holder ceases to provide services to us, he or she is able to exercise his or her vested option for the period of time stated in the stock option agreement to which such option relates, up to a maximum of five years from the date of termination. Generally, if termination is due to death or disability, the vested option will remain exercisable for 12 months. If an option holder is terminated for cause (as defined in the Amended 2010 EIP), then the option holder's options will expire on the option holder's termination date or at such later time and on such conditions as determined by the LDCC. In all other cases, the vested option will generally remain exercisable for three months. However, an option may not be exercised later than its expiration date.

**Restricted Stock Awards.** A restricted stock award is an offer by us to sell shares of our common stock subject to restrictions that the LDCC may impose. ***These restrictions may be based on completion of a specified period of service with us or upon the achievement of performance goals during a performance period.*** The LDCC determines the price of a restricted stock award. Unless otherwise set forth in the award agreement, vesting will cease on the date the participant no longer provides services to us, and at that time unvested shares will be forfeited to us or subject to repurchase by us.

**Stock Bonus Awards.** A stock bonus is an award of shares of our common stock for past or future services to us. ***Stock bonuses can be granted as additional compensation for performance*** and, therefore, are issued in exchange for cash. The LDCC determines the number of shares to be issued as stock bonus and any restrictions on those shares. ***These restrictions may be based on completion of a specified period of service with us or upon the achievement of performance goals during a performance period.*** Unless otherwise set forth in the award agreement, vesting ceases on the date the participant no longer provides services to us, and at that time unvested shares will be forfeited to us or are subject to repurchase by us.

**Stock Appreciation Rights.** Stock appreciation rights provide for a payment, or payments, in cash or shares of our common stock to the holder based upon the difference between the fair market value of our common stock on the date of exercise and the stated exercise price of the stock appreciation right. ***Stock appreciation rights may vest based on time or achievement of performance goals.***

**Restricted Stock Units.** ***Restricted stock units represent the right to receive shares of our common stock at a specified date in the future, subject to forfeiture of such right due to termination of employment or failure to achieve specified performance goals.*** If the restricted stock unit has not been forfeited, then on the date specified in the restricted stock unit agreement we will deliver to the holder of the restricted stock unit shares of our common stock, cash or a combination of our common stock and cash as specified in the applicable restricted stock unit agreement.

**Performance Awards.** ***A performance award is an award of a cash bonus or a bonus denominated in shares that is subject to performance factors. The award of performance shares may be settled in cash or by issuance of those shares (which may consist of restricted stock).***

*Performance Criteria*

***The LDCC may establish performance goals by selecting from one or more of the following performance criteria***: (1) profit before tax; (2) billings; (3) revenue; (4) net revenue; (5) earnings (which may include earnings before interest and taxes, earnings before taxes, and net earnings); (6) operating income; (7) operating margin; (8) operating profit; (9) controllable operating profit, or net operating profit; (10) net profit; (11) gross margin; (12) operating expenses or operating expenses as a percentage of revenue; (13) net income; (14) earnings per share; (15) total stockholder return; (16) market share; (17) return on assets or net assets; (18) our stock price; (19) growth in stockholder value relative to a pre-determined index; (20) return on equity; (21) return on invested capital; (22) cash flow (including free cash flow or operating cash flows); (23) cash conversion cycle; (24) economic value added; (25) individual confidential business objectives; (26) contract awards or backlog; (27) overhead or other expense reduction; (28) credit rating; (29) strategic plan development and implementation; (30) succession plan development and implementation; (31) improvement in workforce diversity; (32) customer indicators; (33) new product invention or innovation; (34) attainment of research and development milestones; (35) improvements in productivity; and (36) attainment of objective operating goals and employee metrics. The LDCC may in its sole discretion, in recognition of unusual or non-recurring items such as acquisition-related activities or changes in applicable accounting rules, provide for one or more equitable adjustments (based on objective standards) to the performance criteria to preserve the committee's original intent regarding such criteria at the time of the initial award grant.

(Emphasis added).

127.  The 2018 Special Proxy harmed Amyris by preventing the Company's shareholders from making an informed decision as to whether to approve to amend the Company's 2010 Equity Incentive Award, which provided additional compensation to the Company's officers and directors. Amyris stockholders would never have voted to amend the Company's 2010 Equity Incentive Plan had they known the Individual Defendants were allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from (i) misusing ASC 606 and to improperly estimate royalty revenue on certain transactions; (ii) overestimating licensing and royalty revenues; (iii) disclosing that Amyris would need to restate financial statements; (iv) disclosing that there was a material weakness in Amyris's internal controls; and (v) making improper representations concerning the Company's financial results, business prospects, and internal controls. The Individual Defendants' actions were contrary to the Company's stated compensation practices in the 2018 Proxy and sought to award compensation not based on performance, but on false and misleading statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

**MISLEADING PROPOSAL TO APPROVE THE ISSUANCE OF THE CEO EQUITY AWARDS**

128.   Defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach also recommended that Amyris stockholders approve the issuance of equity awards to defendant Melo.

129.   In support of the bid to approve the CEO Equity Awards, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach assured the Company's investors that the awards align defendant Melo's interests with those of Amyris's stockholders and "reduce the possibility of business decisions that favor short-term results at the expense of long-term value creation."   In addition, these defendants assured the awards promoted defendant Melo's focus on the Company's sustainable growth and long-term stockholder returns.   In particular, the 2018 Proxy stated:

**Proposal 5 —
Approval of CEO Equity Awards**

**General**

The Board is asking Amyris's stockholders to approve the following equity awards for our President and Chief Executive Officer, John Melo: (i) a stock option to purchase 3,250,000 shares of our common stock, such award being subject to performance-based vesting conditions as described herein (the "CEO Performance Option"), and (ii) a restricted stock unit award for 700,000 shares of our common stock in accordance with the terms described herein (the "CEO RSU" and together with the CEO Performance Option, the "CEO Equity Awards").

The Board's primary objective in designing the CEO Equity Awards is to help Amyris grow and achieve its mission, which would facilitate the creation of significant stockholder value.   There are three main reasons why the Board recommends that stockholders approve the CEO Equity Awards:

- The CEO Equity Awards *strengthen Mr. Melo's incentives and further align his interests with our long-term strategic direction and the interests of our stockholders and reduce the possibility of business decisions that favor short term results at the expense of long-term value creation*;

- The incentives created by the CEO Equity Awards will further ensure Mr. Melo's continued leadership of Amyris over the long-term; and

- The performance and stock price conditions for vesting of the CEO Performance Option *will promote Mr. Melo's continued focus on Amyris's growth, sustainability and profitability to drive sustained, long-term stockholder returns*.

(Emphasis added).

130.   Thus, the 2018 Proxy assured stockholders that defendant Melo's interests were aligned

46

with the Company's long-term strategic direction as well as tied to the stockholders. The 2018 Proxy claimed the CEO Equity Awards would reinforce, or "further," his already existing alignment with these interests. In truth, however, defendant Melo's personal interest to make short-term business decisions aimed at achieving performance targets tied to lucrative bonus awards had eroded his ties with the Company's stockholders and long-term strategic direction.

131.   In particular, under the Company's bonus plan (the "Bonus Plan"), defendant Melo may receive over 100% of his annual salary based on Amyris's achievement of established performance metrics. The most significant performance metric under the Bonus Plan for 2017 was the Company's achievement of GAAP revenue, which was weighted 40%. Based substantially on the Company's GAAP revenue in 2017, defendant Melo received a bonus of $581,948, over 105% of his annual bonus target of $554,166.[3] Under the Bonus Plan for 2018, the weight of the Company's GAAP revenue for purposes of determining bonuses increased from 40% to 50%. This increase further incentivized defendant Melo to inflate the Company's reported GAAP revenue in the short-term at the expense of long-term value creation.

132.   Thus, the CEO Equity Awards neither reduced short-term incentives nor reinforced the link between defendant Melo's interests and the Company's stockholders, as the 2018 Proxy claimed. Rather, the awards merely granted defendant Melo additional and unwarranted compensation in the form of an additional 700,000 restricted stock units on top of his already exorbitant compensation.

133.   The CEO Equity Awards proposal was approved, providing to defendant Melo: (i) a stock option to purchase 3,250,000 shares of Amyris common stock; and (ii) a restricted stock unit award for 700,000 shares of Amyris common stock. Amyris stockholders would not have voted to approve the CEO Equity Awards proposal had they known the Individual Defendants, including defendant Melo, were allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from (i) misusing ASC 606 and to improperly estimate royalty revenue on certain transactions; (ii) overestimating licensing and royalty revenues; (iii) disclosing that Amyris would need to restate financial statements; (iv) disclosing that

---

[3]  On April 1, 2017, defendant Melo's target bonus level increased from 80% to 100% of annual base salary. On June 1, 2017, defendant Melo's based salary increased from $550,000 to $600,000.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

there was a material weakness in Amyris's internal controls; and (v) making improper representations concerning the Company's financial results, business prospects, and internal controls.

134.    The 2018 Proxy harmed Amyris by preventing the Company's shareholders from making an informed decision regarding the overcompensation of defendant Melo.  As a result of the misleading statements in the 2018 Proxy, the Company's stockholders voted via an uninformed stockholder vote to approve the CEO Equity Awards. Now, 700,000 stock units of Amyris, or 1.4% of the total number of Amyris's common stock outstanding as of March 31, 2018, have been granted to defendant Melo despite his breaches of fiduciary duty.

## DAMAGES

135.    As a result of the Individual Defendants' wrongful conduct, Amyris disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Amyris's credibility.  Amyris has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

136.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action, costs associated with the restatements, costs incurred from having to remedy the Company's inadequate internal controls over financial reporting, and costs incurred from compensation and benefits paid to the defendants who have breached their fiduciary duties to Amyris.

137.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Amyris's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.  Specifically, Amyris's has lost approximately $328 million, or 70%, of its market capitalization from its October 2018 high to the present.

138.    Moreover, these actions have irreparably damaged Amyris's corporate image and goodwill.  For at least the foreseeable future, Amyris will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Amyris's ability to raise equity capital or debt on favorable terms in the future is now impaired.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139.    Plaintiff incorporates the allegations herein by reference.

140.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

141.    Plaintiff is a shareholder of Amyris, was a shareholder of Amyris at the time of the wrongdoing alleged herein and has been a shareholder of Amyris continuously since that time.

142.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

143.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Amyris Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

144.    At the time of the filing of this complaint, the Board of Amyris consists of the following twelve individuals: defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills (the "Director Defendants") and non-defendants James McCann and Lisa Qi.

145.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Amyris Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the Director Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS EXCUSED BECAUSE DEFENDANTS MELO, DOERR, DUYK, PIWNICA, WILLIAMS, YANG, EYKERMAN, GOPPELSROEDER, KUNG, AND MILLS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR THEIR MISCONDUCT**

146.    As alleged above, defendants Melo, Doerr, and Kung sold Amyris stock under highly suspicious circumstances.  These defendants, as directors of Amyris, possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Melo, Doerr, and Kung sold stock based on this knowledge of material, nonpublic company information regarding the Company's woefully inaccurate financial statements, inadequate internal controls, and the impending

49

decrease in the value of their holdings of Amyris. Accordingly, defendants Melo, Doerr, and Kung face a substantial likelihood of liability for breach of their fiduciary duties of loyalty. Any demand upon defendants Melo, Doerr, and Kung is futile.

147.    As alleged above, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, and Kung breached their fiduciary duties by negligently issuing the materially false and misleading 2018 Proxy soliciting the reelection of certain directors to the Board, the amendment the Company's 2010 Equity Incentive Plan, and the approval of the CEO Equity Awards to the Company's stockholders. Specifically, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, and Kung misrepresented or omitted: (i) the Board's risk oversight; (ii) that the Individual Defendants' actions regarding the 2010 Equity Incentive Plan were contrary to the Company's stated compensation practices and sought to award compensation not based on performance, but on false and misleading statements; (iii) defendant Melo's incentive to make short-term business decisions to inflate revenue for his personal interest; (iv) that the CEO Equity Awards would not align defendant Melo's interests with those of the Company's stockholders; and (v) that the CEO Equity Awards would not promote the creation of long-term value. Accordingly, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, and Kung face a substantial likelihood of negligence liability for issuing the 2018 Proxy and any demand upon these defendants is therefore futile.

148.    As alleged above, defendants Melo, Doerr, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills recklessly authorized Amyris to false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which defendants Melo, Doerr, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills face a substantial likelihood of liability. If defendants Melo, Doerr, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills were to bring a suit on behalf of Amyris to recover damages sustained

as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to defendants Melo, Doerr, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills.

149. Further, the Company has already admitted that each of its Quarterly Reports filed during 2018 should no longer be relied upon and that Amyris must restate these financial statements, as material errors were made related to estimates for recognizing royalty revenue. Specifically, defendant Melo signed these Forms 10-Q attesting to the accuracy of the reports.

**DEMAND IS EXCUSED AS TO DEFENDANTS DUYK, WILLIAMS, AND MILLS**

150. Defendants Duyk, Williams, and Mills, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for the "oversight of the Company's accounting and system of internal controls." Further, the Audit Committee Defendants are responsible for overseeing "the quality and integrity of the Company's financial reports." Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Duyk, Williams, and Mills face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**DEMAND IS EXCUSED AS TO DEFENDANT MELO**

151. The principal professional occupation of defendant Melo is his employment with Amyris, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In 2016 and 2017, Melo received total compensation of $1,296,624 and $1,993,444, respectively. This amount is material to him. Accordingly, defendant Melo lacks independence from defendants Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills due to his interest in maintaining his executive position at Amyris. This lack of independence renders

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

defendant Melo incapable of impartially considering a demand to commence and vigorously prosecute this action.

152.    Moreover, defendant Melo is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS EXCUSED AS TO DEFENDANTS MELO, EYKERMAN, AND GOPPELSROEDER**

153.    The Company has admitted that defendants Melo, Eykerman, and Goppelsroeder lack independence.  As noted in the 2018 Proxy:

> The subjective test under the NASDAQ rules for director independence requires that each independent director not have a relationship which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.  The subjective evaluation of director independence by the Board was made in the context of the objective standards referenced above.  In making independence determinations, the Board generally considers commercial, financial and professional services, and other transactions and relationships between Amyris and each director and his or her family members and affiliated entities.

> Based on such criteria, the Board determined that (i) Mr. Melo is not independent because he is an Amyris employee, (ii) Mr. Vuillez is not independent because he is an employee of Total (with which we have a joint venture arrangement and commercial and financial relationships, as described below under the Section titled "Transactions with Related Persons"), and (iii) Messrs. Eykerman and Goppelsroeder are not independent because they are each employees of DSM (with which we have a commercial and financial relationship, as described below under the Section titled "Transactions with Related Persons").

154.    This lack of independence renders defendants Melo, Eykerman, and Goppelsroeder incapable of impartially considering a demand to commence and vigorously prosecute this action.

**DEMAND IS EXCUSED AS TO DEFENDANT DOERR BECAUSE HE CANNOT CONDUCT AN INDEPENDENT INVESTIGATION OF THE WRONGFUL CONDUCT**

155.    Defendant Doerr is not an independent director because he would risk the continued financial support of Amyris if he initiated litigation against defendant Melo and other Board members. Defendant Doerr is a partner of a venture capital firm, Kleiner Perkins Caufield & Byers and indirectly owns all the membership interest in Foris.  As of May 14, 2019, Foris held 18,540,044 shares of Amyris common stock representing 18.9% of the Company's outstanding shares.  Moreover, in April 2019,

52

Foris had led a $34 million private placement, and Foris in June 2019 paid the Company $8.5 million in exchange for a promissory note. The financial connection between Foris and Amyris are extensive.

156.    As a venture capitalist, defendant Doerr will not sue CEOs of the companies he is invested in given the fierce competition in the industry to find suitable investments.  Venture capitalists are aware that their investment opportunities would become even scarcer if CEOs believed that they could be sued by them.  Thus, defendant Doerr will not initiate litigation against defendant Melo because he controls Foris and would be at a risk of losing future investment opportunities with the Company if such a suit occurred.

**DEMAND IS EXCUSED AS TO DEFENDANT KUNG BECAUSE HE CANNOT CONDUCT AN INDEPENDENT INVESTIGATION OF THE WRONGFUL CONDUCT**

157.    Defendant Kung is also incapable of impartially considering a demand.  Defendant Kung is the founding partner of Vivo Capital LLC ("Vivo").  As of April 29, 2019, Vivo and its affiliated funds held 6,489,314 shares of the Company's stock, representing 6.6% of the Company's outstanding shares.  As the Company stated in the 2018 Proxy, "[defendant] Kung is a founding member of Vivo and a voting member of the general partner of Vivo entities that hold our common stock, Series D Preferred Stock and warrants, and may be deemed to share voting and dispositive power over the shares held by such entities."  Like defendant Doerr, defendant Kung will not sue CEOs of the companies he is invested in, as it may risk his future investment opportunities.

**DEMAND IS EXCUSED AS TO DEFENDANT PIWNICA BECAUSE SHE CANNOT CONDUCT AN INDEPENDENT INVESTIGATION OF THE WRONGFUL CONDUCT**

158.    Defendant Piwnica is another director that has a financial interest in not pursuing litigation against defendant Melo and other Board members.  Defendant Piwnica is a director of NAXOS US, and she has been designated by that company to serve as its representative on Amyris's Board.  Throughout the years, Naxyris S.A. ("Naxyris") (a subsidiary of NAXOS UK) has used defendant Piwnica to attain financially advantageous deals from Amyris.  In July 2015, Naxyris entered into a Securities Purchase Agreement with Foris and another entity to purchase certain of Amyris shares.  Under that agreement, Naxyris was able to receive stocks at a heavily discounted rate of $1.56 per share and $0.01 per share for certain stocks even though the Company's common stock was trading

53

at over $23 per share. Under defendant Melo's tenure, Naxyris derived substantial benefits from through its deals with Amyris. As a result, defendant Piwnica cannot impartially consider initiating litigation against defendant Melo and other members of the Board.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR

### BREACH OF FIDUCIARY DUTY

159.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Amyris's business and affairs.

161.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Amyris.

163.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

164.   In addition, the Individual Defendants further breached their fiduciary duties owed to Amyris by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from (i) misusing ASC 606 and to improperly estimate royalty revenue on certain transactions; (ii) overestimating licensing and royalty revenues; (iii) disclosing that Amyris would need to restate financial statements; (iv) disclosing that there was a material weakness in Amyris's internal controls; and (v) making improper representations concerning the Company's financial results, business prospects, and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

165.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

166.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

167.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amyris has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiff on behalf of Amyris has no adequate remedy at law.

## COUNT II

**AGAINST THE DEFENDANTS MELO, DUYK, DOERR, PIWNICA, WILLIAMS, YANG, EYKERMAN, GOPPELSROEDER, KUNG, AL THANI, VUILLEZ, AND REINACH FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT**

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach. The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

172.   Defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy. In the 2018 Proxy, the Board solicited stockholder votes to reelect defendants Melo, Eykerman, Kung, and Williams to the Board, amend the Company's 2010 Equity Incentive Plan and approve the CEO Equity Awards.

173.   The 2018 Proxy, however, misrepresented and failed to disclose: (i) the Board's accounting failures resulting in unwarranted compensation to defendant Melo; (ii) Amyris executives' incentive to inflate the Company's revenue; (iii) the Board's risk oversight; and (iv) the Company's inadequate internal controls which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Amyris misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect defendants Melo, Eykerman, Kung, and Williams to the Board, amend the Company's 2010 Equity Incentive Plan and approve the CEO Equity Awards.

174.   Plaintiff, on behalf of Amyris, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper reelection of defendants Melo, Eykerman, Kung, and Williams to the Board, amendment the Company's 2010 Equity Incentive Plan and approval of the CEO Equity Awards.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

## COUNT III

### AGAINST THE INSIDER SELLING DEFENDANTS FOR INSIDER SELLING
### AND MISAPPROPRIATION OF INFORMATION

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    At the time each of the Insider Selling Defendants sold his or her Amyris stock, he or she knew the material, non-public information described above, and sold Amyris stock on the basis of such information.

177.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Amyris stock.  Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Amyris stock.

178.    The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Amyris for insider trading.

179.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

180.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

181.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Securities Class Action that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revisiting its past financial statements.

183.    As a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Amyris to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

184.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT IV

### AGAINST DEFENDANTS MELO, VALIASEK, AND THE INSIDER SELLING DEFENDANTS FOR UNJUST ENRICHMENT

186.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187.    By their wrongful acts and omissions, defendants Melo and Valiasek were unjustly enriched at the expense of and to the detriment of Amyris.  Defendants Melo and Valiasek were unjustly enriched as a result of the compensation they received while breaching fiduciary duties owed to Amyris.

188.    Additionally, the Insider Selling Defendants sold Amyris stock while in possession of material, nonpublic information that artificially inflated the price of Amyris stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

189.    Plaintiff, as a stockholder and representative of Amyris, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

190.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Declaring that Plaintiff may maintain this derivative action on behalf of Amyris and that Plaintiff is a proper and adequate representative of the Company;

B.  Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.  Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of Amyris stock while in possession of insider information as described herein;

D.  Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 1, 2019                                    Respectfully Submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

*/s/ W. Scott Holleman*
W. Scott Holleman (#310266)
Marion C. Passmore (#228474)
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: holleman@bespc.com
          passmore@bespc.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Email: mhynes@hh-lawfirm.com
lhernandez@hh-lawfirm.com

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

**VERIFICATION**

I, James Carlson hereby verify that I have authorized the filing of the attached

Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder

Derivative Complaint and that the facts therein are true and correct to the best of my knowledge,

information and belief. I declare under penalty of perjury that the foregoing is true

and correct.

September ____**17**____, 2019

_____

James Carlson (Sep 17, 2019)

James Carlson